Good morning. May it please the Court, I am William Bailey on behalf of the Appellant, Justin Johnson. In this case, Your Honors, we have very little dispute about the essential facts. We had a young, inexperienced crew member serving aboard a vessel who received no training. The Court found, as a matter of law, that there was no responsibility for the ladder being greasy, but the Court, as a matter of fact, found that the reason Justin Johnson fell and sustained serious injury was because the ladder step was greasy and or his boots and his gloves were greasy. So there was a finding by the Court that the floor, when we inspected it later, it was still greasy and the Court can see there this is a textile product. And I don't have a whole lot of house cleaning experience, but when you have a textile product and you have a petroleum product that goes on top of that, it's pretty hard to get that clean. So, when we look also at Justin Johnson's behavior here, his superior officer was Mr. Mike Parnell, the engineer. Now, the vessel is quick to point out that Mr. Parnell did not give the order to grease the winches that day, but as I point out to the Court in my footnote on page 8 of my opening brief, Mr. Parnell wasn't on deck that day. He was down below attending to things. The winch was stuck. We know that for a fact. This was the first outing the vessel had been in storage for some time, and we have a young man who was work ethic oriented, who was trying his best to impress people. He's thrilled to be on this vessel, as he stated. This was the first big boat he had served on. So he did the best he could with what he knew to get this winch working again. And Mr. Parnell admitted, when I cross-examined him, what do young crew members do if they aren't trained on how to grease this winch? But there was testimony that it was not part of his job to grease the winch, right? Your Honor, there was testimony on that, but then there was Mr. Cavanaugh who testified it is part of every crew member's job to keep the equipment operating. So Mr. Parnell did say that he didn't give the order that day, although he wasn't even on deck. But Mr. Cavanaugh, as I point out in my brief, acknowledged, as so did All you're doing is, you know, pointing out a conflict in the record. All right, Your Honor. But that doesn't mean the district court has to find in accordance with your version, does it? That's right, Your Honor. We have a de novo standard here for conclusions of law, and the court relied on an overruled Second Circuit. That's not a conclusion of law as to whether it was his job to grease the winch. That's correct, Your Honor. To find out a fact. That's correct, Your Honor. All right. That's clear error. Yes, that's right. And And you're just pointing to, you know, contrary evidence, but again, you know, the fact finder is not required, you know, to believe in the same version you believe in. That's right, Your Honor. Well, but that's all you're pointing to. All right. Well, I will quickly take my cue from the court and shift to the de novo findings. The court relied on the Pinto case from the Second Circuit to say there can be no liability for a temporary condition. That is clearly wrong, Your Honor. The United States Supreme Court in the Ustner v. Lukenbach case overturned that. The Second Circuit itself, as I point out in my brief, in the Rays and the Calderola case on page 12, effectively overruled the Pinto case. And in our I think that's your seaworthiness claim, correct? That's correct, Your Honor. That is correct. And in our circuit, in the Rabitsky case decided in 1996, we adopt the same standards here, that a temporary condition can be the basis of an unseaworthiness claim. So under the de novo standard, the trial court made a clear error of law. And so deciding this Is it a difference who might have caused the temporary condition? The cases say not, Your Honor. It just the condition is there. And it doesn't matter if it's temporary as long as it's dangerous and presents a hazard. Did the district court make a finding of fact that prior to the accident, that the top rung of the ladder was greasy? There was no finding on that, Your Honor. The court found because it was temporary There was testimony going in both directions, but to my belief, there was not a clear finding of that. The other clear error standard here, Your Honors, deals with the Olson v. Statesline case that I stated in my brief 1967, that deals with the competency of the crew, which goes to both Jones Act and unseaworthiness. The vessel owner wants to have it two ways with regard to Mr. Parnell, the engineer. They're quick to point out that he was plaintiff's supervisor, that he did not give an order that morning to grease the winches. He wasn't on deck. It doesn't surprise me he didn't give that order. But this supervisor, with 15 years experience, modeled the wrong behavior over and over and over again. He went down the ladder, Mr. Parnell did, facing aft. He was young Mr. Johnson's boss. He admitted he saw Mr. Johnson do this repeatedly, said nothing to him because that's the way he went down the ladder, too. So the vessel owner is chargeable with knowledge of improper practices by the crew. They don't even have to know, but in this circumstance, we have a superior demonstrating this behavior and seeing the plaintiff. Now, what makes a difference, a critical difference in this error of law, Your Honors, is the vessel captain, as I point out in my reply brief, who was a friend of the appellant's father. And I asked him, his father said this young man is responsible and hardworking and takes instructions well. Do you believe that, too? The vessel captain said yes. Should Mr. Parnell have admonished him not to go down the ladder that way? Yes, he should have. Did you, the vessel, fail in your obligation to train him by not admonishing him? Yes. If you had told him the right way to go down the ladder, would he have done so? Yes. So under Olson v. Statesline, the vessel owner should have known. They did know. A supervisor knew the way Mr. Johnson went down. And the district court relied heavily on this finding of fact and declaring that Mr. Johnson was entirely at fault. So there was constructive knowledge. There was actual knowledge. We didn't have to prove either of those. But in fact, the vessel captain admitted that Mr. Parnell, the supervisor, should have done something here. So that is the other critical error of law committed by the trial court. And, Your Honors, maybe this is a matter of fact, Judge Tshishima, but part of the core of this case is safety. We had the only safety person that testified, and that was Mr. Richard Gleason, who had a great deal of experience with OSHA. And as I point out to the court on page 20, I believe it's page 24 of my brief, this court may consider OSHA standards in ruling on whether or not there is unseaworthiness or safety or duty under the Jones Act, as set forth in the Rabitsky case. And OSHA points out one of the leading causes of death and injury on the job happened on ladders. Unsafe ladders. The court found that this was a matter of common sense. But if it was common sense, why in the safety training manual on board this vessel did it include instruction on how to go down the ladder properly? So OSHA requires that this training be done before the individual even starts. And as Mr. Gleason pointed out, workers who are on the job six months or less are the most likely to get in accidents. So there is a duty to have a unseaworthiness cases where young, inexperienced crew members were held to where the vessel owner was chargeable with the duty to train them. And I have submitted to the court substantial authority from OSHA that if someone is going to get hurt on a job, it's a ladder that's the likely place to do it. And in terms of the error of law here, the court failed to apply the standard of causation that this circuit has uniformly done over the years, as I have pointed out in my brief. We are dealing with a featherweight standard of causation here. The Jones Act is remedial social welfare legislation, essentially in the place of workers' compensation. So essentially what the court did here was to rule that comparative fault was a complete bar to recovery. And that is wrong. That is not the law. And that is one important reason why we are here before this court. We have a dangerous occupation as the Ninth Circuit has observed many times. Going to sea is among the most dangerous of jobs. And the very captain in this case admitted to that and that they had a duty to train this young man. And on a key point where the court held this was common sense, this man's had a chance to change the way this young man went down the ladder. The vessel captain admitted everything he knows about this young man. If the vessel had even made minimal steps towards training him. So what would the training be? Just you need to go down the ladder, facing it? Oh, Your Honor, when you state it that way Demonstrate for me what's the proper way to go up and down the ladder. Do it for me or something? Is that what the proper training would be? That's part of it, Your Honor. And Mr. Gleason says that this is about a one-day OSHA course. And I'm not sure what all is involved in it. But in the safety manuals, how to do it, how to hold on to it. It would seem, just looking at this ladder that you, you know, the picture of the ladder that you provided in the excerpts of record, it's straight up and down. It's true. You know, it doesn't take a lot to realize if you go down it, if you're back towards the ladder, it's going to be very dangerous. Well, Your Honor, I'm a landlubber. And it is pointed out in the record, well, when Mr. Bailey went on the boat, how did he go up? I was holding on for dear life. But part of what we have here is a passing on of knowledge between a senior part of the crew and a junior one. And so going down the ladder is not a wise thing to do. I agree with the court. But at least Do you think in the record that he was sort of oriented on various practices throughout the boat? He was not, Your Honor. Were there aspects of, you know, parts that one needs to be aware of about the ship? It was a very Darwinian approach, Your Honor. He came on the vessel. He was assigned duties. And thinking back to jobs I did in high school and college and law school, the last thing a young person wants to do is admit their incompetence. You try and do the best you can. And so there was no safety training of any kind on this vessel. They had the manual that was stored somewhere down below, as the captain said. No one was asked to read it. There was no emphasis on any instruction at all. So in terms of the duty to have a competent crew, when you know you have a green crew member and the captain admitted they knew he was inexperienced, nothing was done to train him in anything, whether it was the ladder or greasing the winches. And that's really a significant part of the problem and why OSHA is important, because the number of injuries and deaths on the job go down. So as Mr. Gleason pointed out in his testimony, you can't just say something is common sense. Statistics show that generally when people get hurt on the ladder, it's because they're doing, they're using it improperly. I'd like to go back for a second to the unseaworthiness aspect of it. And I would wonder how you would explain this statement from the district court. It says, because Clay failed to demonstrate that the top rung of the ladder was unreasonably greasy or otherwise dangerous, the court finds the defendant not negligent and the vessel not unseaworthy due to the condition of the top rung of the ladder. Isn't that specifically a finding, that the top rung of the ladder was not unduly greasy or dangerous? Your Honor, if you look to other findings made by the court, it does indicate that the ladder was greasy and led to the fall by Mr. Johnson. Here he's making a specific finding, concluding at the end of the paragraph, dealing with unseaworthiness. Well, Your Honor, he also goes on, on page 5, that this was a rare special circumstance, which again is an error of law here. That wasn't the basis of his finding. His finding right here on unseaworthiness is that it wasn't greasy or dangerous. Yes, Your Honor, I understand that. But he also found that the fall occurred because the ladder was greasy and or the boots and the gloves. So it was the conclusion that was drawn from that, and given the standard of causation in this circuit, and what was relied on, that it was a transient condition. As I interpret this, Your Honor, that's the reason why there was a defense finding here, a defense judgment, because it was a transitory condition, not that it was greasy. Thank you very much. All right. Thank you. We'll hear from the vessel. May it please the Court, I'm Donald Marankovich, and I represent the appellees. First of all, I don't think I have to remind the Court that because this was an admiralty trial, this Court must treat the appeal as one where you'd have to find that the findings of the Court and the conclusions of law were clearly erroneous. There was certainly ample evidence and overwhelming evidence in the record that would support what the Court found in this case. I'll briefly address the greasy ladder issue. The Court, based upon the evidence of the crew that they had spent six days prior to this event in cleaning the vessel, and that the vessel was, in fact, cleaned, even Mr. Johnson himself admitted that at trial, is ample evidence that the ladder itself was in good condition and clean. With regard to the top rung of the ladder, which is the only rung applicable to this case, because that's where the plaintiff said he fell from, the Court specifically found that it was in good condition. The photographs that were offered in evidence would support that. And the defendant's expert, who testified at trial, testified that he examined that top rung, which was in the, had not been altered since the accident, and he examined it like a year, year and a half after the event, and found it to be in good condition, and he ran some coefficient of friction tests on it and found it to be quite adequate. What the Court determined in this case is that, really, that Mr. Johnson did a lot of, did several foolhardy things, one of which he tried to descend this ladder in an improper fashion, that is, facing aft, away from the ladder, and secondly, that he had unnecessarily got himself covered with grease and tried to descend this ladder with greasy gloves, with greasy boots. That's because nobody trained him on how to grease a winch, right? Pardon? That's because he had no training on how to grease a winch. Well, I guess that's right. Well, of course, the owner says that was not part of his duty. But the fact is, Your Honor, that I don't think you have to, and the Court still found that you don't have to train people, first of all, to face a ladder when you're going to go up or down the ladder, and secondly, that you don't have to teach people that it's foolhardy to get grease all over yourself and not try to clean it up before descending a ladder. And there's absolutely not a shred of evidence in this record that there was any circumstance that would have prevented Mr. Johnson from cleaning himself up, getting rid of, if he tried to descend that ladder. There was no emergency. None of that kind of thing existed. With regard to the winch, the part of the winch that was stuck, and there's no question that there was part of it that was stuck, didn't require greasing. And there's ample evidence in the record that this winch, the entire winch had been and there was really no need to grease the winch. Were you the, just out of curiosity, were you the trial lawyer? Yes, I was, Your Honor. Was there a waiver of jury trial, or did the Court just say it's an admiralty case, so there's no right to jury trial? Do you remember? I just, I just, yeah, there was no jury. I know that, but I was trying to figure out why. Did the plaintiff ask for a jury trial? Well, the plaintiff, of course, would determine whether or not a jury trial was going to be demanded. One was not, and it was filed in admiralty. So it was strictly an admiralty case, and there was no jury demand? That's correct, Your Honor. Even with the Jones Act claim, it's a strict admiralty case? Well, certainly would be entitled, the plaintiff would have been entitled to have filed. Well, and there's a saving, as you know, there's a savings to suitor provision, right, in the admiralty law? That's correct, Your Honor. I was wondering why this was not tried to a jury. Well, the unseaworthiness claim would normally, standing alone, but it was an admiralty claim that would be tried in admiralty. Right. He could have had a jury trial in the Jones Act claim, and apparently he didn't ask for it. That's correct, Your Honor. All right. I'm just curious, that's all. Go ahead. The appellant has made a big point of this transitory unseaworthiness condition or concept, and there's no question that, as decided by the Supreme Court in Mitchell v. Trawler Racer many years ago, transitory unseaworthiness is no longer the law. The court, in this case, didn't rely on transitory unseaworthiness. What the court said was that we had a ladder that was properly maintained, and in particular, the rung from which the plaintiff fell was in good condition, and that what happened is, because of the acts of the plaintiff himself, that part of the ladder was caused to be greasy. So, in effect, what the court has found is that the sole cause of the accident was the plaintiff's action. And certainly there could be situations where you could have a temporary, unreasonable amount of grease in an area where a person slips, and that could, even though it may have been temporary, could cause unseaworthiness, but that isn't what we have here. Did the district court actually say that there was grease on the ladder at the time he fell? Well... On the top rung, that is. In the findings, and I'll see if I can find it. I thought it said that there was no evidence that there had been prior to the time of the incident, that no evidence was presented that the top rung of the ladder or the ladder or the area leading up to the ladder was in a greasy condition. That's correct. The court... And that the plaintiff had been working on the winch and then decided to leave the area and to descend and did so with his... Greasy gloves. Gloves, and he may well have had grease on his shoes. That's exactly... And he hit the top of the ladder, and in that condition that he was in, he slipped and went out. That's exactly what the court found. That's what I understood happened. Is that basically correct? Well, here's line one from finding fact number six. It's on page... Which page, Your Honor? Page 068. Okay. But page three of the decision, the fall occurred because plaintiff's boot and or the ladder step were greasy. That's correct. Now, he doesn't definitively say which one. He just says and or. Because, you know, obviously given the facts in the case, it would be really speculation to decide... To try to figure out which... What happened. And I suppose one could surmise that if there were grease on his boots, he may well have gotten some grease on the... On the run. But there's certainly no evidence in the case that prior to the time that Mr. Johnson attempted to descend the ladder, that the rung in question was greasy or otherwise defective. But then also it's the... In his conclusions of law, Judge Lasnik says at the top of page five, page 70. The second paragraph, because plaintiff failed to demonstrate that the top rung of the ladder was unreasonably greasy. So it's almost like saying it wasn't greasy, right? That's right. And I think the court certainly correctly found that there's no duty to teach seaman or train seaman in very basic, simple tasks. As an example, we all know that you better well take your fingers out of the door jamb before you close the door. But you don't have to tell people that. And that's what the court determined in this case, that this was such a simple thing and so open and obvious, that one should not try to descend the ladder in that manner, that there was no duty to train him in that aspect. Well, let me ask you this. You know, if a new seaman joins the crew, isn't there some obligation on the captain to ensure that all employees are admonished in all aspects of the operation and use of the patrol? I think that's correct, Your Honor, particularly with regard to tasks that are potentially dangerous. I might add that there's been emphasis by... When you're out at sea, it could be potentially dangerous in any condition, whether you're coming down in the proper condition or in the proper way or even in the way that... That's correct, Your Honor. I mean, being on a boat has some danger to it. But here, first of all, the appellant would paint himself as a greenhorn who had never been on a boat before. That isn't true. He'd worked on, as I remember, three other vessels before he joined our vessel. They were all fishing vessels. And then joined our vessel in the previous, the summer before this accident, and worked for a month or two on our vessel. So he was very familiar with it. And then came back, joined the vessel. In fact, joined it in the shipyard while it was being cleaned up and otherwise ready for service, and then made the trip from Seattle to Kodiak, where they were going to operate out of. So he was certainly familiar with this vessel and other vessels. And his father was a longtime fisherman. And the appellant had grown up in a fishing family and was familiar with... been around boats essentially all his life. And I think that certainly bore on the court's findings. I'm happy to answer any of the questions, but I just hope. All right. Thank you, Mr. Marinkovic. Thanks very much. All right. Over to Bob. I just would like to respond to one point that Judge Hugg raised. Judge Hugg, you asked me about the top stuff being unreasonably greasy. And there is some ambiguity in the record. But I'd like to point out the Blassen Gill case mentioned in my brief. There we had a cargo handling operation. And the vessel owner said, we provided safe equipment. The reason the accident occurred was it was being used unsafely. And the Ninth Circuit said, that may be. But we draw no distinction between sound equipment being used unsafely and unsafe equipment. The net result is the same. The seaman gets injured. So given the court's question, and there are statements going both ways in Judge Lesnik's opinion. But under Blassen Gill, even if we assume that the thrust of your question, that there was no finding that it was unreasonably greasy, the court did find that Mr. Johnson went down the ladder improperly in a way that contributed to his fall. An unsafe procedure. And when you combine this court's ruling and Olson v. Stateline, the employer had constructive notice of that. We know the engineer knew. But we don't even need to prove that under Olson. They had a duty to admonish Justin Johnson to not go down the ladder that way. Did not do so. And so under Blassen Gill, even if the top rung was not unreasonably greasy, the vessel owner is still liable. Thank you very much. All right. Thank you. Thank both counsel. This case is submitted for decision. Next and final case on today's argument calendar is Voice Stream Wireless v. Federal Insurance.
judges: Hug, Tashima, Paez